BROOKE WEITZMAN SBN 301037
WILLIAM WISE SBN 109468
ELDER LAW AND DISABILITY RIGHTS CENTER
2372 Morse Ave, Suite 471
Irvine, California 92614
t. 949-407–9057
e. bweitzman@eldrcenter.org
e. bwise@eldrcenter.org

CAROL A. SOBEL   SBN 84483
MONIQUE ALARCON SBN 311650
FRED ZELAYA   SBN 305848
LAW OFFICE OF CAROL A. SOBEL
3110 Main Street, Suite 210
Santa Monica, California 90405
t. 310-393-3055
e. carolsobellaw@gmail.com
e. monique.alarcon8@gmail.com
e. fred.zelaya3@gmail.com

[Additional Counsel on Next Page]
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| TAMMY SHULER, GLORIA SHOEMAKE, MELANIE PAYNE, SARA LEANNE WEAVER, NICK MASTRISCIANO, as individuals, FOR HIM MINISTRIES, an unincorporated association;<br>　　　　　Plaintiffs,<br>　　v.<br>ORANGE COUNTY,<br>　　　　　Defendant. | Case No.:   cv-17-00259<br>Civil Rights Complaint<br><br>42 U.S.C. § 1983: Fourth, Fifth, and Fourteenth Amendments;<br>Cal. Const. Article I, Sections 7 and 13;<br>Title II of the Americans with Disabilities Act;<br>Section 504 of the Rehabilitation Act of 1973;<br>Cal. Gov. Code § 11135;<br>Cal. Civ. Code § 51 *et seq.*<br>Cal. Civ. Code § 2080 *et seq.* |

1

PAUL L. HOFFMAN  SBN  71244
CATHERINE SWEETSER   SBN 271142
SCHONBRUN, SEPLOW, HARRIS & HOFFMAN
723 OCEAN FRONT WALK
Venice, California   90291
t.  310-396-0731
e. hoffpaul@aol.com
e. catherine.sweetser@sdshhh.com

## JURISDICTION AND VENUE

1.       This is an action for injunctive and declaratory relief and damages pursuant to 42 U.S.C. § 1983 based upon the continuing violations of Plaintiffs' rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983 and questions of federal constitutional law.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

2.       Venue is proper in the Southern Division of the Central District in that the events and conduct complained of herein all occurred in Orange County.

## PRELIMINARY STATEMENT

3.       Deaths of homeless people in Orange County reached an all time annual high of 200 in 2016.[1]  In 2008, Orange County recognized the desperate need and formed the Orange County Ten-Year Plan to End Homelessness Working Group "to serve and protect the homeless . . ."[2] Despite those efforts, the homeless population in the County continued to grow reaching nearly 4,500 at the 2016 point in time count. With only 606 year round shelter beds and 493 seasonal shelter beds, most of the homeless people in Orange County are forced to live outside.[3]

According to the homeless assessment completed in October 2016 by Susan Price, the Orange County Care Coordinator, in 2016 64% of jobs available in Orange County did not pay enough to afford a one-bedroom apartment, rents increased dramatically and the affordable housing stock declined in the face of

_____

[1] http://www.ocregister.com/articles/homeless-743047-county-people.html

[2] http://ochmis.org/documents/10YrPlan.pdf

[3] http://cams.ocgov.com/Web_Publisher_Special/Agenda10_18_2016_files/ images/HOMELESS%20ASSESSMENT%20DCC%20FINAL%20REPORT%20- %2010.18.2016_9848755.PDF

gentrification in formerly low-income neighborhoods across Orange County. This translates to over 2,000 unsheltered individuals, nearly all of whom are living in tents, various makeshift shelters and in their vehicles throughout the city.

4.       While the County has made some progress in helping families and veterans to get housed, the homeless population continues to grow.  With almost 90,000 people on the housing authority waiting lists hoping for access to affordable housing[4], the housing resources are woefully insufficient.

5.       According to the ACLU report "Nowhere to Live," 33 of the 34 cities in the County criminalize homelessness. To avoid the harassment, many people move to remote locations such as the Santa Ana riverbed.   One side of the river bed backs up to a housing complex. The other side of the river bed is where people have lived under street and highways, without restrooms or clean water, and with limited access to service resources, hoping that law enforcement would not interfere while they try to survive.

6.       Nearly 500 people lived in the Civic Center until late 2016 when the city incrementally evicted each encampment, replacing public space with fences. While the County did open an emergency shelter in Santa Ana, it was quickly filled to capacity with people dropped there by hospitals, city police, social workers, and others with nowhere else to bring homeless people.  As a result, many of the people who occupied the Civic Center were forced to the Santa Ana river bed, a place officers led them to believe they could stay, the last place they thought they could keep the limited belongings they own.

7.       Despite agreeing that housing is the solution to homelessness, there is no immediate source of funding for the County that will alter the homelessness crisis soon. In the meantime, the County has begun a renewed vigorous and cruel

_____

[4] Price report, pg. 21

enforcement of so-called "quality of life" offenses against the homeless, seizing and destroying their property if they do not relocate.  To hasten this eviction, Orange County Public Works began installing rocks and dirt in the former encampment, calling it a flood control maintenance project.

8.     The need to respond to the increasing numbers of unsheltered individuals in Orange County is hardly new and neither is the approach of criminalizing - rather than housing - people who are homeless.  Over the past 25 years, the County's primary response has been to invest in approaches that address the visible presence of homeless people, without actually reducing the number of residents on the street each night.  These approaches include criminalizing homelessness by making it illegal to sleep in public places at night and by the seizure and destruction of homeless people's property.  The identical practices have been repeatedly challenged and enjoined by judges of the Central District in Los Angeles and the Ninth Circuit, uniformly rejecting the criminalization of homelessness.  There is no credible reason why Orange County officials would not be aware of the judicial rulings on these issues because they have been highly publicized throughout the region, if not the nation.

9.     In 2006, the Circuit enjoined nighttime enforcement of Los Angeles Municipal Code ("LAMC") § 41.18(d), that made it a crime to lie, sit or sleep on a public sidewalk any time of day or night anywhere in the City.  The Court held that the law, as enforced, violated the Eighth Amendment.  *Jones*, 444 F.3d 1118, 1138 (9th Cir. 2006), vacatur per settlement, 505 F.3d 1004 (2007).  In 2012, the Circuit upheld a preliminary injunction entered by the district court in *Lavan v. City of Los Angeles,* 693 F.3d 1022 (9th Cir. 2012), 133 S.Ct. 2855 (2013) *cert denied.  Lavan* challenged the enforcement of LAMC § 56.11, proscribing the placement of any personal property on public property. *Lavan v. City of Los Angeles,* 797 F.Supp.2d 1005 (C.D. Cal. 2011).  In *Lavan,* the district court enjoined the City from seizing property of unhoused individuals that is not abandoned, evidence of a crime or

creates an immediate public hazard without complying with due process notice requirements. The injunction also barred the City from summarily destroying seized property and ordered the City to store the property for 90 days, consistent with state law. In affirming the rights of the plaintiffs in *Lavan,* the Ninth Circuit underscored that the "simple rule [i.e. notice and an opportunity to be heard by an impartial tribunal] holds whether the property in question is an Escalade or a [tent], a Cadillac or a cart." 693 F.3d at 1032.

10.    In all, the City of Los Angeles has been successfully sued six times to stop the unlawful seizure and summary destruction of the personal property of homeless individuals. *See Bennion v. City of Los Angeles*, LASC Case C637718 (1987); *Justin v. City of Los Angeles*, 2000 U.S. Dist. LEXIS 17881; CV-00-12352 LGB (CD Cal. 2000); *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (CD Cal. 2011); *aff'd,* 693 F.3d 1022 (9th Cir. 2013). The most recent injunction issued in *Mitchell v. City of Los Angeles*, No. 16-cv-01750 SJO (GJSx) (C.D. Cal. 2016) [Dkt. 51 (Apr. 13, 3016)]. These cases established that the government may not take the property of unhoused persons simply because it is in a public place. Any property that is taken must be in an accessible site and must provide meaningful opportunity to reclaim the property promptly, especially when the loss of essential items increases the risk of exposure to the elements. Finally, as *Lavan* established, the personal property of homeless individuals may not be destroyed as abandoned simply because no one is present when it is seized. Here, as in *Lavan*, the government knows that the property is not abandoned, so it may not be destroyed.

11.    Laws that criminalize otherwise innocent conduct solely because the individual is unhoused without any alternative to living in public spaces have been repeatedly rejected by the courts of this Circuit. For example, in 2014 the Circuit invalidated as unconstitutionally vague LAMC § 85.02, which made it a crime for a person to park or stand a vehicle on any public property in the City if the person

"lived" in the vehicle "day to day, overnight or otherwise." *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014).

12.     Despite all of these directives from the Ninth Circuit that homelessness is not a crime, and the affirmation of the constitutional rights of this vulnerable community, the County has seized personal property and largely destroyed it without an opportunity for the rightful owner to reclaim it.  Moreover, the County's procedures for storage of what little property it does not destroy fails to provide an adequate opportunity to recover the property.  The storage facility is located in Lake Forest, 22 miles from the river bed where the property is taken, and held in a facility that has exceedingly limited access.  In addition, it is only open one hour on one day a week, and then only by prior arrangement.

13.     With rare exception, the plaintiffs do not have vehicles to transport them to the storage facility.  Even if they take public transportation to the storage location, they have no way to get back to the river bed with their property because they cannot take it on the bus.   For individuals with cognitive, physical, medical or psychological challenges, this task is even more daunting.  The immediate consequence is people whose property is taken are forced to survive fully exposed to the elements of cold and wet weather with inadequate protection because their blankets, tents and other critical property was seized and destroyed by the County.

14.     The County knows that the consequences of their actions are to create an immediate danger to the health and safety of homeless persons living near the river bed.  The County's approach is even more indefensible when viewed against the directives issued by the United States Interagency Council on Homelessness ("USICH"), composed of nineteen federal cabinet and agency heads to organize federal efforts to end homelessness. The most recent USICH report, "Ending Homelessness for People Living in Encampments," is directly on point and counter to the approach taken by the County to homeless individuals forced to live along the river in large part because of the government's failures over decades.

15.     Specifically, the USICH underscored that "forced dispersal" of homeless encampments is inappropriate and undermines the goal of providing services to homeless individuals.  While the USICH underscored the importance of "intensive and persistent outreach and engagement," the County implemented "intensive and persistent" seizure and destruction of personal property, putting an already vulnerable community at extreme peril.

**FACTS**

16.     On or about late January, the County put up signs along the Santa Ana river bed.  The signs directed that it is a misdemeanor to obstruct free movement in a public place.  The County also posted notices listing purported resources for the people living in the river bed area.  In fact, none of those resources were realistic because all of the services were unavailable.  There are presently approximately 1,000 people living along the river bed, including about 320 people who live in the area targeted in early February, where the Plaintiffs stayed.

17.     Shortly after, on or about February 1, 2017, County employees from Public Works brought in bulldozers and began to destroy the property of homeless individuals in the area, with Orange County Sheriff's deputies also present.

18.     County employees posted a leaflet advising where the property was taken, also listing a phone number.  The address on the leaflet was incorrect. When Morgan Denges, a local community organizer who also assists people in the river bed, drove to the location listed on the flyer and found that there was no such address, he called the number on the flyer and, after some time, was transferred to a Public Works maintenance supervisor, Bob Barilla.  Mr. Barilla stated that the County discarded the property if there was no one there at the time to claim it or vouch that it belonged to someone.  He confirmed that on February 8, 2017, Public Works was present and directed Plaintiff Schuler to remove her property and that part of the property was thrown away by the County.

19.     In response to an inquiry about how the stored property, if any, could be retrieved, Mr. Barilla informed Mr. Denges that it was necessary to make an appointment to have a County employee come to the storage facility.  The facility is not staffed otherwise. These statements to Mr. Denges were consistent with the information on the posted notice.  The notice advised individuals whose property was taken that it could be reclaimed from the storage facility only on one day a week from 1 to 2 p.m. on Thursdays and then only with a confirmed appointment.



20.     The storage facility is difficult to find because the wrong address is on the flyers.  At the correct location, near the Saddleback Church, there is a very small sign that say Orange County Public Works Portola Lot.  There is no sidewalk in the area and the nearest bus stop is approximately a half mile away.

### PARTIES

**PLAINTIFFS:**

**Tammy Schuler**

21.     Plaintiff TAMMY SCHULER has been homeless in Orange County for about six years. She relocated to the Santa Ana Riverbed with her stepfather about a year and a half ago.  She relocated, in part, because her property was confiscated regularly by city police departments and she wanted to maintain a bit of stability in her life. Soon after moving, her stepfather passed away.

22.     Ms. SCHULER is 41 years old and suffers from significant health problems, resulting in extreme fatigue and limiting her physical activity. Her condition has declined recently because of the increased stress and fear of leaving the river bed for medical appointments when her might be seized in her absence.

23.     On February 8, 2017, OC Sheriff's deputies and Public Works employees arrived at the river bed and informed Ms. SCHULER that she had one hour to move her property out of the river bed.  In the past, the County had posted signs and then taken them down.  For this reason, she did not expect the sweep would occur that day.  Because of recent heavy rains, many of Ms. SCHULER's belongings were wet and hung up to dry. After the deputies and other County employees told her to move, they stayed in close proximity and brought in a garbage truck. Ms. SCHULER tried to move as much as she could but, because of her disabilities, she quickly became exhausted.  A photograph of Ms. Schuler at this time is attached at Exhibit A.

24.     Ms. SCHULER felt pressured by the close presence of the deputies and Public Works employees.  Knowing that she had no means to access the storage facility in Lake Forest, and feeling pressured by the law enforcement presence to quickly get what she needed and give up the rest, Ms. SCHULER felt she had no option but to see the County   dispose of the belongings she was unable to get outside the fence in the allotted time. Ms. SCHULER borrowed a cart from a friend to transport as much as possible across the river bed. Some of her property was left outside the fenced area by the County for her to transfer later, but without any means of transportation and accessible storage she was compelled to leave much of her property inside the fenced off area.  This included her tent, which is seen being dismantled by County workers in Exhibit B.

25.     She was never told that any of her property that remained would be stored by the County and believes that what she physically could not remove was destroyed including clothes, bedding, food, paperwork, and hygiene products. It was particularly difficult for her to sort through the wet items.  Immediately after she was forced out of the fenced in area, her property was removed and the County dumped large boulders on the site, which, on information and belief, was done to prevent her return.

26.     Ms. SCHULER had a bicycle that she used for transportation, but the bicycle was destroyed when County Public Works employees ran over it with a truck while removing the property of Ms. SCHULER and other homeless individuals at the river bed.

**Gloria Shoemake:**

27.     Plaintiff GLORIA SHOEMAKE has been homeless in Orange County since October 2014. She has lived in different parts of the river bed during that time. She has multiple disabilities that affect her ability to focus and complete tasks. To help with this disability, she has emotional support animals.  During an earlier County maintenance project, Ms. SHOEMAKE was forced to relocate. As

1  she was gathering her belongings, she asked an officer if she could bring them to

2  another location and return for the rest of her items. They were already packed.

3  When she returned to get the rest of her possessions, she was informed that the

4  county had destroyed her remaining property.

5      28.    In December 2016, Ms. SHOEMAKE returned to her camp to learn

6  that, without notice, a County employee had taken everything outside the tent.

7  Because of a recent rain, many items were set out to dry. Despite the objection of a

8  friend who was present when the County started to seize Ms. SHOEMAKE's

9  property, the County took tents, clothes, blankets, tarps, tools, and a briefcase with

10  medical documents, among other items.  Ms. SHOEMAKE was informed that

11  items could be recovered by appointment during a one hour window each week in

12  Lake Forest. The following week Ms. SHOEMAKE received her General Relief

13  and hoped to pay someone for a ride to reclaim her belongings. However, despite

14  multiple calls to the Lake Forest facility, there was no answer and no answering

15  machine. A few weeks later, she had her phone stolen and has been unable to call

16  since. Because she would have to pay someone for a ride to the location, she is

17  afraid to go without an appointment and unable to make an appointment.

18  **Melanie Payne:**

19      29.    Plaintiff MELANIE PAYNE has been homeless in Orange County for

20  approximately one year. During that time, her belongings have been taken by the

21  County on at least three occasions.

22      30.    Most recently, in November 2016 Ms. PAYNE placed a tent, blankets,

23  and a bin of personal items, including small electronics, in the area where she

24  sleeps. When she returned, she saw all unattended items outside of tents had been

25  taken from the area and was informed by other homeless individuals present at the

26  time that it was the County workers in the truck.  Ms. PAYNE observed that the

27  County truck was still in the areas, farther down the river bed and chased it. When

28  she reached the truck and asked to recover her property, County workers denied

taking it and informed Ms. Payne that she could not check the seized property in the truck at that time.  Ms. PAYNE does not have a vehicle and would be unable to get to Lake Forest to reclaim belongings if they were brought there. If she took the bus, she would not have been able to bring most of her belongings back on the bus.

**Sara Leanne Weaver:**

31.    Plaintiff SARA LEANNE WEAVER has been homeless in Orange County for approximately seven years. Until 11 months ago, she stayed near the Civic Center, but left that area for the river bed after she was physically attacked in the Civil Center location. Ms. WEAVER suffers from seizures as a result of her epilepsy.  On or about February 6, 2017, WEAVER had a seizure and was taken to the hospital, where she remained overnight.  When she returned to the river bed the next day, she found her property had been removed.  She was informed by other persons who stayed in the vicinity that it was done by County workers.  Without warm clothes and blankets, WEAVER experienced increasing stress. She began having seizures multiple times per day.  The increasing seizures have left her unable to cope with the challenges of being homeless on a daily basis.

32.    NICK MASTRISCIANO suffers from a traumatic brain injury.  On or about February 8, 2017, he was approached by County workers and deputies while in the river bed and told that he had one hour to remove his property.  He was surrounded by Sheriff's deputies who pressured him to hurry.  He was repeatedly asked if he really needed to keep some of his property.  As he was collecting his property, he observed the County employees take some of it and toss it into a trash truck.  He retrieved the property.  Because of his disability and the time allotted, he was unable to remove all of his property.  He lost his driver's license, critical paper work about his public benefits, his telephone, blankets, a sleeping bag, clothes and the canopy and tarps he used to protect himself and his property from the elements.

33.    Mr. MASTRISCIANO had to leave some of his property behind in the fenced off area at the end of the hour.  He was never given a receipt for any of the

property that remained.  Based on what he observed earlier of his property being
tossed in the trash truck, on information and belief he understands that his property
was not marked in any way that would identify it as his and allow him to reclaim
it.  He was never told that the excess property would be stored by the County.
Even if was made aware of this, he has no way of getting to the facility because he
does not have a car.  He has no way of calling for an appointment, even if he could
get there with a ride, because his telephone was thrown away by County workers.

34.    Without his tarps, canopy and other protective items, his remaining
property has been exposed to the rain.  As a result, the medications that he takes
became wet and were destroyed.  Moreover, without a telephone, he cannot receive
critical reminders about essential medical appointments.  Because of his traumatic
brain injury, it is difficult for him to recall such appointments just by memory.

**For Him Ministries:**

35.    Plaintiff FOR HIM MINISTRIES, founded in 2012 by Danny
Sommerville, is a local unincorporated community of women and men who assist
homeless individuals in Orange County.  The group was formed by Danny
Sommerville, who serves as the group's outreach coordinator.  Mr. Sommerville
has gone to the Santa Ana river bed frequently over the past five years and almost
daily for the last two years.  The group serves meals to individuals living in the
river bed, connects people to services, provides basic necessities, and drives people
to access services, including showers, shelters, and medical care.

36.    Over the past few weeks, Mr. Sommerville has had to refocus a
substantial amount of time by FOR HIM MINISTRIES on helping unhoused
people who are forced to move further into the river bed, or forced to move from
the river bed by the County.  The group is now compelled to spend time assisting
homeless individuals to protect and remove their property before it is confiscated
or thrown away by the County workers.  This is time that the group would have
spent on providing other assistance and connecting people to services.

14

**DEFENDANT:**

37.    Defendant ORANGE COUNTY is a government entity with the capacity to sue and be sued.  The departments of the COUNTY include the Department of Public Works, the entity that seized and destroyed Plaintiffs' property, and that operates the storage facility on El Toro Parkway.  Employees of the COUNTY have engaged in the acts complained of herein pursuant to the policies, practices and customs of the COUNTY.

38.    The Defendant, its employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

39.    The identities and capacities of defendants DOES 1 through 10 are presently unknown to plaintiffs, and on this basis, Plaintiffs sue these defendants by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE defendants when ascertained.  Plaintiffs are informed, believe, and thereon allege that DOES 1 through 10 are, and were at all times relevant herein, employees and/or agents of the Defendant COUNTY and are responsible for the acts and omissions complained of herein.  Defendants DOES 1 through 10 are sued in both their official and individual capacities.

## THE SEIZURE AND DESTRUCTON OF PROPERTY

40.    On information and belief, since at least the beginning of February, the COUNTY, acting through the Public Works Department, has carried out a policy, custom or practice of seizing and summarily destroying the property of homeless individuals living near the Santa Ana river bed.  Some of the property has been stored at a location that is largely inaccessible for the property owners

because of the difficulty of getting to public transportation to get to the facility, and the extraordinarily limited time access to the facility.

41.     COUNTY workers have come to the river bed location, seized the property and primarily thrown it in garbage trucks, without any display of concern about the care in handling the property.  It is treated as if it is presumptively trash, immediately disposing of nearly all of the property, including tents, blankets, shoes, clothing.  On information and belief, the COUNTY's policy, custom and practice is to seize the property as abandoned and destroy it if the property owner is not present at the time that the COUNTY workers are there.

42.     The County has inadequate provisions for storage of personal property by homeless individuals.  Moreover, items such as blankets, sleeping bags, warm clothing and tents are necessary throughout the day during the winter months, in particular.  The majority of the property is simply thrown away.

43.      Any property that is not destroyed is, purportedly, transferred to a storage facility located near the intersection of El Toro and Portolla parkways. This site is approximately 22 miles from the river bed, a 45-minute trip by car. The closest public transportation stop is approximately a half mile away from the storage facility.  El Toro Road is a major thoroughfare with high traffic and limited sidewalks along this route between the bus stop and the storage place. There is no sidewalk in front of the storage location.

44.     The storage facility is only open once a week for one hour and then only by prior appointment. To access the facility, an individual must have a working and charged telephone to call the number on the posted sign.  Many of the individuals living at the river bed do not have cell phones, or have phones with limited monthly minutes that usually run out before the end of the month.  At times, the County number posted at the location is not answered, either by an individual or even a voicemail system.

16

45.    Because of the limited hours that the individual can obtain their property, someone who travels the 22 miles from the river bed will not be able to obtain their property the day they get to the facility, if at all.  There is not an employee at the property so appointments cannot be made in person.

46.    For individuals with cognitive, medical, physical, mobility, or developmental disabilities, or compound disabilities, their ability to navigate this distance and process is difficult, if not impossible.  As a result, even if any items are stored, the individual never sees them again.

## THE HEALTH AND SAFETY RISK TO UNHOUSED PERSONS

47.    A large percentage of the persons living at the river bed have or are at serious risk for health problems.   The risk is greatly increased by several factors, including a lack of shelter, especially in the winter months when it is cold and rains; preexisting health conditions; and the advanced age of many chronically homeless residents.

48.    The danger created for unhoused individuals by the systematic seizure and destruction of their property, including the most basic necessities like blankets, tents and tarps, is obvious and particularly so in the winter.  Although Orange County often enjoys warm weather during daytime in the winter, at night the temperature regularly drops to 50 and below.  This crosses the threshold for the risk of hypothermia, and increases the risk of other illnesses that can result from sleeping unsheltered outside, particularly in the rain.  Moreover, when the wind-chill factor[5] is included, the threat increases.

49.    The National Oceanic and Atmospheric Administration ("NOAA") utilizes an index that takes into account advances in meteorology, biometeorology,

---

[5] Wind-chill is the cooling effect of wind on exposed skin.  *See,* www.nws.noaa.gov/forecasts/wfo/definitions/defineWindChill.html

and computer modeling to create a formula that accurately calculates this perceived temperature, and warns the public about the dangers from exposure to winter winds and low temperatures.  Essentially, this index shows how wind speeds dramatically impact how quickly the human body loses heat.

50.    According to NOAA records, the average night time temperature in Orange County was 48 degrees, and to date in February it has been 51 degrees, both well below the threshold for hypothermia.  During the same time period, there has been over 10 inches of rain.  These numbers do not factor in the effect of a wind-chill.  Winds of only 5 miles per hour reduce applied temperatures by 2 degrees; winds of 15 miles per hour create a wind-chill factor that reduces the temperature felt by the body by 6 degrees; and winds of 25 miles per hour produce a wind-chill factor of -8.1 degrees.  Combining the rain impact and wind-chill factor, the night time temperatures are at the mid to low 40 degrees. Thus, even in the County's moderate climate, the temperatures experienced by homeless individuals exposed to the elements consistently fall well-below 50 degrees, the threshold where individuals are exposed to hypothermia.

51.    Defendants are well aware of the danger the homeless community faces and recognized it in their plans to open transit terminal shelter.  But even without this public recognition, it is plain common sense that protection from the cold and rain is an identifiable human need.  Unprotected exposure to cold and rain presents a serious risk of illness and death to someone living outdoors with only minimal or no protection once their property is seized and destroyed.  A policy that ignores the "mutually enforcing effect" of destroying property and leaves people to live on the streets manifests actionable deliberate indifference.

52.    Defendants' present justification for destroying Plaintiffs' property is because they need the location to store boulders.  Although the County has offered to transfer people to shelters, that is an empty promise, as the County well knows.  There are few shelters in all of Orange County and those that exist are either over

capacity, or do not permit individuals to bring their service animals or personal property with them.  This approach strips Plaintiffs of their constitutional rights precisely because of Defendants' failure to take adequate, let alone any, steps to address the most fundamental needs of homeless persons for a safe environment. Moreover, the consequence of Defendants' policies and practices is to leave Plaintiffs in the cold, literally.

**FIRST CAUSE OF ACTION**
**Right to Be Secure From Unreasonable Seizures**
**42 U.S.C. §1983 - Fourth Amendment;**
**Art. 1, §13, California Constitution**

53.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

54.    Defendant and its employees and agents violated Plaintiffs' Fourth Amendment rights to be free from unreasonable seizure of their property by confiscating and then destroying Plaintiffs' property without a warrant.

55.    These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional rights to be secure in their property.

56.    Plaintiffs are informed and believe that the acts of the Defendant and its employees and agents were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, were deliberately indifferent to the likely consequence that the property would be seized and destroyed unlawfully in view of the fact that the right at issue was well-established at the time.

57.    As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and personal injury.

## SECOND CAUSE OF ACTION
### Right To Due Process Of Law; 42 U.S.C. § 1983
### Fifth And Fourteenth Amendments; Art. I, § 7

58.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

59.    Defendant, its employees and agents, owed Plaintiffs a duty under the due process clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution and Article I, § 7 of the California Constitution to protect the personal property of the Plaintiffs.  This duty applied to preserving the personal property of individuals arrested and taken into custody.

60.    Despite this well-defined duty, Defendant provided Plaintiffs with inadequate notice that their property was at risk of being seized and/or destroyed and did not act to preserve the property or provide adequate means of reclaiming it in a timely manner even though the right to such notice and preservation of property was well-established at the time.

61.    Plaintiffs are informed and believe that the acts of the Defendant, its employees and agents, were intentional in failing to protect and preserve Plaintiffs' property and that, at minimum, were deliberately indifferent to the likelihood that the property would be seized and destroyed without due process based on the past occurrences of these same constitutional and statutory violations of the law.

62.    Defendant has seized and destroyed the personal property of the Plaintiffs without due process, lawful justification, or just compensation.

63.    As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer loss of their personal property and are entitled to compensatory damages for their property and other injury to their person.

## THIRD CAUSE OF ACTION
### Violation of Civil Rights: 42 U.S.C. § 1983, Fourteenth Amendment
### State Created Danger

64.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

65.    By taking and destroying the tents, tarps, blankets and clothing of the Plaintiffs, Defendant, its employees and agents, have created a danger for Plaintiffs by exposing them to the elements in the winter without adequate shelter.

66.    As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and continue to suffer actual and potential injury to their health and safety and are entitled to compensatory damages for their property and other injury to their person.

## FOURTH CAUSE OF ACTION
### Violation of 42 U.S.C. § 12101 et seq.: Title II of the
### Americans with Disabilities Act

67.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

68.    Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be … denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

69.    At all times relevant to this action, Defendant, its employees and agents, were public entities within the meaning of Title II of the ADA and provided programs, services, or activity to the general public.

70.    At all times relevant to this action, the individual Plaintiffs were qualified individuals with one or more disabilities within the meaning of Title II of the ADA and met the essential eligibility requirements under Title II.

21

71.    Defendant's policies and practices in seizing and destroying Plaintiffs' blankets, tents, and other protective gear utilized methods of administration that violate Plaintiffs' rights on the basis of their disabilities. 28 C.F.R. § 35.130(b)(3).

72.    The acts and omissions of the Defendant, its agents and employees, subjected Plaintiffs to discrimination on the basis of their disabilities in violation of Title II of the ADA by destroying their property, and for storing any remaining items following the seizures in a way that was inaccessible and unreasonable.

73.    Plaintiffs knew, or should have known, that the incidence of disabilities for people who are homeless is extremely high, with estimates as high as more than one in two homeless individuals suffering from some significant cognitive, psychological, medical or physical disability, and many suffering from compound disabilities.  As a public entity, Defendants are required to "make reasonable modifications in policies practices, or procedures when such are necessary to avoid discrimination on the basis of disability" where, as here, modifications to would not "fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7).  This includes the need to make reasonable accommodations to protect the essential life-protecting property of persons who are homeless, as well as provide prompt and reasonable access to ensure that individuals are able to recover seized property and accessible transportation to and from any storage facility. The policies, practices and procedures challenged in this action, even if otherwise facially neutral, unduly burden disabled persons who are without shelter and within the federal definition of homeless.

74.    Defendant committed the acts and omissions alleged herein with intent and/or reckless disregard for the rights of each of these Plaintiffs.

75.    Plaintiffs are informed and believe that Defendant and its agents and employees have failed and continue to fail to adopt and enforce adequate policies and procedures for interacting with homeless individuals with disabilities.

76.     As a result of Defendant's action and those of its agents and employees, Plaintiffs have suffered injury to their persons and property and are entitled to damages.

## FIFTH CAUSE OF ACTION
### Violation of 29 U.S.C. § 794: Section 504 of the Rehabilitation Act of 1973

77.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

78.     Section 504 of the Rehabilitation Act of 1973 provides in pertinent part: "[N]o otherwise qualified individual with a disability … shall, solely by reason of his or her disability, … be subjected to discrimination under any program or activity receiving federal financial assistance …." 29 U.S.C. § 794.

79.     The individual Plaintiffs were, at all relevant times, qualified individuals within the meaning of the Rehabilitation Act because they have a mental and/or medical impairment that substantially limits one or more of their major life activities." 29 U.S.C. § 705(20((B).

80.     At all relevant times and continuing to the present, Defendant CITY was the recipient of federal funding within the meaning of the Rehabilitation Act.

81.     The acts and omissions by Defendant and its agents and employees complained of herein were committed with intent and/or reckless disregard for the rights of the above-named individual Plaintiffs and discriminated against them on the basis of their respective disabilities.

82.     As a direct and proximate result of the aforementioned acts and omissions by Defendants, Plaintiffs have suffered and continue to suffer injury to their persons, including pain and suffering and are entitled to compensatory damages according to proof.

## SIXTH CAUSE OF ACTION
## California Government Code § 11135

83.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

84.     Section 11135(a) of the California Government Code provides in pertinent part: "No person in the State of California shall, on the basis of … disability, … be unlawfully subjected to discrimination under any program or activity that is funded directly by, or receives any financial assistance from, the state."

85.     Upon information and belief, at all times relevant to this action, Defendant received funding and/or other financial assistance from the State of California sufficient to invoke the protections of Section 11135 et seq.

86.     Defendant, its agents and employees, have violated Government Code § 11135 by unlawfully subjecting the individual Plaintiffs to discrimination for the reasons set forth above.

87.     As a direct and proximate result of the acts and omissions of Defendants, their agents and employees, the individual Plaintiffs have suffered and continue to suffer injury, including but not limited to pain and suffering.

## SEVENTH CAUSE OF ACTION
## Unruh Civil Rights Act, California Civil Code § 51 et seq.

88.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

89.     California Civil Code 51 et seq. provides in pertinent part that: "All persons within the jurisdiction of this state are free and equal, and no matter what their … disability … are entitled to the full and equal … privileges, or services in all business establishments of every kind whatsoever."

90.     Pursuant to California Civil Code § 51(f), a violation of the ADA necessarily is a violation of the Unruh Civil Rights Act.

91.     Defendant, through its agents and employees in the LAPD and other City Departments, is a "business establishment" within the meaning of § 51.

92.     The acts and omissions complained of herein denied Plaintiffs their rights on the basis of their disabilities and were done with intent or reckless disregard for the rights of the individual Plaintiffs' as disabled individuals.

93.     As a direct and proximate result of the aforementioned acts, the individual Plaintiffs have suffered and continue to suffer injury, including but not limited to pain and suffering.  Plaintiffs are entitled to all of the relief available pursuant to California Civil Code § 52.

## EIGHTH CAUSE OF ACTION
### California Civil Code § 2080, *et seq.*

94.     Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

95.     Defendant's policies, practices and conduct challenged herein violated California Civil Code § 2080 *et seq.*, in that Defendant's agents and employees failed to protect and preserve the personal property of Plaintiffs when the property was seized; failed to provide adequate written notice pre-seizure and post-deprivation notice so that Plaintiffs would have the opportunity to reclaim their property within a reasonable time.  California Code of Civil Procedure § 2080 *et seq.* imposes a mandatory duty to maintain property that is not abandoned.

96.     Defendant, its agents and employees, had a duty owed to Plaintiffs to protect their personal property under California Civil Code §§ 2080.2, 2080.4 and 2080.6.  Plaintiffs' property was not abandoned at the time that Defendant seized it and immediately destroyed it.  Defendant breached the duty to protect Plaintiffs' personal property when their agents and employees wrongly exerted dominion over the property and denied Plaintiffs' their constitutional and statutory rights.

97.     Defendant had no legitimate governmental interest that gave their agents and employees the legal right or justification to confiscate Plaintiffs'

property and then immediately demolish it without prior notice to Plaintiffs and without a constitutionally sufficient procedure to permit Plaintiffs to recover their property, and without fair compensation to Plaintiffs.

## INJUNCTIVE RELIEF

98.    Plaintiffs reallege and incorporate the allegations set forth in the preceding paragraphs as though fully set forth hereat.

99.    A real and immediate difference exists between Plaintiffs and Defendant regarding Plaintiffs' rights and Defendant's duty owed to Plaintiffs to protect Plaintiffs' personal property present in the Santa Ana Riverbed, and in all public space.  Defendant's policies and actions have resulted and will result in irreparable injury to Plaintiffs.  There is no plain, adequate or complete remedy at law to address the wrongs described herein.  Defendant has made clear by its unlawful seizures and immediate destruction of the property of unhoused individuals that it intends to continue these practices of confiscating and immediately destroying the property of homeless individuals from public spaces without a warrant and notice.  Defendant has also made clear that they intend to continue the practices described above that make it exceedingly difficult, if not impossible, for homeless individuals to reclaim their property, even when some of it is not immediately destroyed.  The only storage facility is 22 miles from the river bed location and only open one hour on one day a week, and then only if an appointment is made in advance to meet a County worker at the storage facility and see if an individual's property is there to be reclaimed.  Unless restrained by this Court, Defendant will continue these unlawful policies and practices.

100.    Defendant's acts alleged above violate established constitutional rights of Plaintiffs and Defendant could not reasonably believe that the conduct of its agents and employees in seizing and destroying Plaintiffs' property was lawful.

101.    An actual controversy exists between Plaintiffs and Defendant in that Defendant, its agents and employees, have engaged in the unlawful and unconstitutional acts alleged herein and intend to continue to do so.  Plaintiffs claim that these acts are contrary to law and seek a declaration of their rights with regard to this controversy.

102.    As a direct and proximate consequence of the acts of Defendant's agents and employees, Plaintiffs have suffered and will continue to suffer injury to their person and the loss of their personal property, including all their clothing, bedding, tents and other personal possessions, stripping them of the essentials needed for their well-being and personal dignity and placing them at serious and immediate risk of grave illness from living in the elements with no protection.

**WHEREFORE**, Plaintiffs pray as follows:

1.    For a temporary restraining order, preliminary and permanent injunction, enjoining and restraining Defendant from seizing and immediately destroying property of homeless individuals without adequate procedures for accessible storage and recover of the property;

2.    For a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violate Plaintiffs' rights under the United States and California constitutions and the laws of California;

3.    For an order directing Defendant to provide replacement of blankets, tents, tarps, clothing and other essential items to anyone whose property is seized for whatever reason, including purported public health and safety grounds;

4.    For an order directing Defendant to maintain the property at a location closer to the river bed and open during regular business hours;

5.    For an order directing that any property taken be segregated by owners and not combined with the property of any other person;

6.    For damages to the individual plaintiffs in an amount to be determined according to proof based on their federal claims only;

7.    For costs of suit and attorney fees as provided by law;

8.    For such other relief as the Court deems just and proper.

Dated: February 13, 2017        Respectfully submitted,

LAW OFFICE OF CAROL A. SOBEL
ELDER & DISABILITY LAW CENTER
SCHONBRUN SEPLOW HARRIS & HOFFMAN


_____/s/ Carol A. Sobel_____
By: CAROL A. SOBEL
Attorneys for Plaintiffs

28

EXHIBIT A
Photo by Mindy
Schauer of OC Register



EXHIBIT B
Photo by Mindy Schauer of the
OC Register

